———————o———————

## THE JEFFERSONVILLE, MADISON, AND INDIANAPOLIS RAIL-ROAD COMPANY v. BEATTY.

RAILWAY.—*Fencing Road.*—*Liability.*—A railroad company is not required by the statute to fence its road, where such fencing would result in cutting itself off from the use of its own land, or leased property, or buildings, or wood sheds, although the buildings or sheds may not be in present use; and if cattle are killed at such a point by the cars of the company, it is not liable, unless there is proof of negligence or want of care or skill on the part of the persons operating the train.

APPEAL from Bartholomew Common Pleas.

BUSKIRK, J.—This was an action commenced by Beatty, the appellee, against the appellant, before a justice of the peace, under the statute, for the value of a cow killed by appellant's cars. The case was appealed to the Court of Common Pleas, where there was a jury trial and verdict for plaintiff below, for fifty dollars. A motion for a new trial, for the reason that the verdict was contrary to the evidence, was overruled, and the question for this court to determine is whether the evidence warranted the verdict. Appellant insists that the judgment ought to be reversed, for the reason that the evidence in the case, there being no conflict in the testimony, clearly failed to sustain the verdict.

It was admitted that plaintiff's cow was killed by defendant's cars, and that she was worth fifty dollars. Beatty, the plaintiff, testified as follows: The cow was killed in 1869; he found her lying just south of Walesboro, in Bartholomew county, on the east side of a switch, and south of platform, and north of cattle-guard, as shown by plat exhibited to witness. The cow was lying about thirty-five feet south of south end of platform; the indications on the track were that she was struck about thirty feet south of south end of the platform. On cross examination, plaintiff stated that as shown on said plat, there was a highway, marked on the plat "street," running nearly east and west, immediately south of Walesboro, extending up to it from the north, and that there is one residence on the west of the railroad, and south of the highway, as shown on said plat. There is a main track and switch of appellant's road, as shown on said plat, also a cattle-guard at the south end of the switch, as shown on this plat. The west side of the railroad is securely inclosed by fence and woodshed, as shown by plat, from said highway south to said cattle-guard. On the east side, from the east end of said cattle-guard, there is a secure fence, as shown by said plat, north, thence east, and thence north to said highway. The distance from said point where said last named fence intersects the highway, west, along the highway

to the railroad track, is about eighty or ninety feet. It is about twenty-five or thirty feet from track of railroad to this fence at the south. There is no fence along said highway between said two points. The space east of the main track and switch is securely fenced, except along said highway. Said space east of said track is, and has been for several years, used by the railroad company as a shipping yard, where cars are loaded and unloaded with lumber upon and from cars on the switch. There is another platform north of said highway, not shown in the plat, in the town of Walesboro, which is mostly used by the company, but the platform as shown on the plat south of the highway is used occasionally by passengers getting off of long trains going north, from rear cars, and for express matter from forward car of long trains going south; but this is not very often; it is only occasionally. The said space and track could be securely fenced by running a fence from the east side of said switch, along said highway east of said fence, intersecting the highway as aforesaid, and by constructing cattle-guards across said switch and main track and the space between them, but such cattle-guards would obstruct the passage of persons to and from said platform south of the highway. The railroad company could erect a gate in said fence for ingress and egress of shippers of lumber. The woodshed has not been used for many years. The road could be securely fenced by running a fence from the cattle-guard north to the south end of the platform, and then a cattle-guard across the track; the lumber could be loaded at the platform, and passengers and freight at the platform would not be interrupted. This fence would prevent loading lumber south of the platform, or it could be fenced along the highway to the track, thence south along the track to the south end of the platform, and then a cattle-guard across the track.

James Stader testified that the cow was struck thirty feet south of the platform; the railroad company leased said yard from witness for shipping purposes several years since, and it has been so used continuously since. The lumber is

loaded on the cars on said switch, and piled and stacked in said yard for shipment. The most of the loading and un-loading is done along said switch, from the highway to the south end of the platform, and the yard to that extent is mostly used, but the whole length of the switch from the highway to the cattle-guard, as well as the yard, are occa-sionally used for shipping purposes as aforesaid. Most of the freight is put on cars north of the highway in Wales-boro. He testified the same as plaintiff as to fencing.

Dr. Clark testified substantially the same as the preceding witnesses, as to description of premises, the use of platform, switch, and shipping yard. He further testified, that a fence could be built from said point in said "street" where said west fence intersects it from the south, south-west to a point on said switch at or near the south end of said platform, and from thence cattle-guards across switch, space between, and main track, and thus inclose all of said yard and switch and track south of the fence, and cattle-guards; and access could be had to said yard south of said fence by means of a gate through the fence; or fence along the highway to the railroad track, thence south along the track to the south end of platform, then a cattle-guard across the track; or a fence from the cattle-guard north to south end of platform, then cattle-guard across track; this would inter-rupt loading lumber south of platform, but it could be done at or near the platform. It is eighty feet from the track to fence along the highway east to the fence, twenty-five or thirty feet at the south end from track to fence, and four hundred feet from highway to cattle-guards; there is no fence along the highway.

In behalf of the defendant, Phil. M. Dailey testified that the plat from which witnesses testified is correct; that the same was made by him upon actual view of the premises, and measurements of distances, and the plat was given to the jury in evidence.

From the foregoing evidence, and the diagram which is in

the record, it appears that the situation of the locality where the cow was killed is as follows: The railroad runs north and south through the town of Walesboro, and across, at nearly right angles, a highway or "street" at the southern limits of the town. A switch east of the main track runs through the town across the highway south to a cattle-guard, four hundred feet south of the highway. On the west, the railroad is securely inclosed by fence and woodshed from the highway to the cattle-guard; from the east end of the cattle-guard, which is twenty-five or thirty feet wide, there is a secure fence, north, north-east and north to the highway, at a point eighty feet east of the railroad. It will be seen from the evidence that the east line of the company's right of way is about equidistant between the switch and the north end of the last described fence. There is a platform north of the highway not seen on the plat, in the town of Walesboro, mostly used by the company. South of the highway, and adjoining it, there is another platform between the main track and switch, which is occasionally used by passengers getting off of rear cars of trains going north, and for receiving and delivering express matter from express cars going south. The space east of the side track not owned by the company, was leased several years ago by the company, and has been continuously since, with the ground owned or claimed by the company, used as a shipping yard for lumber, the lumber being loaded and unloaded on and from cars on the switch, and the lumber piled and stacked in the yard. The switch and yard are principally used only as far south as the south end of the platform, but occasionally the switch and yard are used as aforesaid, all the way to the cattle-guard.

The space embracing the yard, main track, and side track, from the highway south to the cattle-guard is securely inclosed except from the highway; within this space, about thirty feet south of the platform, the cow was struck by appellant's cars.

It is earnestly insisted by the appellant, that the locality described could not properly have been more securely fenced

than it was; that to require other and further fencing, would be to require the company to incommode the public, and deprive herself of her proper and legitimate use of her own property and corporate rights. "Railway companies are not responsible for damages accruing to domestic animals from want of fences at points which do not properly admit of being fenced, as in the immediate vicinity of engine houses, machine shops, car houses, and wood yards." 1 Redf. on Railways, 469. It will be seen that in the cases put, it would affect directly the rights of the railroad companies only, to require them to fence, whilst in this case the rights of the public would be injuriously affected as well as the company. In this court the same doctrine is established by a uniform current of decisions, commencing with the *Lafayette & Indianapolis R. R. Co.* v. *Shriner*, 6 Ind. 141.

The law, as stated by Redfield, in his valuable work on Railways, is fully sustained by this court in the cases of the *The Indianapolis, etc., R. R. Co.* v. *Kinney*, 8 Ind. 402, and *The Indianapolis, etc., R. R. Co.* v. *Oestel*, 20 Ind. 231.

The plaintiff below in his evidence says, what is perfectly apparent, that said space and track could be securely inclosed by running a fence along the highway from the switch east to the fence, intersecting the highway, and by constructing cattle-guards across the main track, switch, and space between, but the cattle-guards would obstruct the passage of persons across the highway to and from the platform south of the highway. And he says a gate could be erected in the fence for ingress and egress to and from the yard. The fence along the highway would answer no practical purpose without the cattle-guards, for without them cattle could enter from the highway on either track or the space between them. The platform south of the highway was put there by the company for a legitimate and proper purpose. The evidence shows what that purpose was, and although not constantly used, yet whenever its use is required, whenever it will subserve the convenience of the company or the public, they have the right to a free and unobstructed way to and

The Jeffersonville, Madison, and Indianapolis R. R. Co. *v.* Beatty.

from the platform. Before the company can be required to cut herself and the public off from the platform, its abandonment must be shown; until then the right to its free use continues.

If the company in this case is required to erect and maintain a gate, much more ought she be required so to do in localities in the immediate vicinity of her machine shops, car houses, and wood sheds; for in the latter cases the company only would be directly affected and inconvenienced, whilst in the former both the company and the public would be inconvenienced. This is a question of law, based upon the conceded patent fact that it can be done, whether the company is bound to erect and maintain the fence and gate. The company leased the yard for her own convenience and the use of the public, and we think that she and the public have the right to the free and unobstructed use of it.

The same witness says: "The road could be securely fenced by running a fence from the cattle-guard to the south end of the platform, and then a cattle-guard across the track; the lumber could be loaded at the platform, and passengers and freight at the platform would not be interrupted. This fence would prevent loading lumber south of the platform; or it could be fenced along the highway to the track, thence to the south end of the platform, and then a cattle-guard across the track."

The first fence and cattle-guard leave the track open from the highway to the south end of the cattle-guard, and cattle would be free to enter upon the track from the highway; and because the cow happened to be struck a short distance south of the south end of the platform, and the road was not inclosed from the south to the south end of the platform, it is contended that the company is liable. This fence and cattle-guard would simply make the trap smaller than it now is, and besides, it would deprive the company and the public of the use of all the switch and yard south of the south end of the platform. No abandonment is shown, and no good reason can, we apprehend, be given why the com-

pany should be compelled to abandon this part of her switch and yard. The last fence cuts off, entirely, teams from the yard and leaves the same trap.

Another witness says a fence could be run from a point on the highway where the west north-and-south fence intersects it, diagonally across the yard to the south end of the platform, and there cattle-guards, and that a gate could be made through the fence.

From the evidence, about the correctness of which there is no controversy, the company owns about half of the space between the fence and the switch, and to require her to fence along the west side of the switch, would be to require her to cut herself off from her own ground, and to require her to fence on her line would cut off nearly half of the yard, and all leased from Stader.

And again, the company ought not to be required to fence on account of the wood shed, for although not now used, it stands there the property of the company, and it ought not to be required of her to deprive herself of the use of it whenever it may be needed or required by the company. The company has just as much right to this property and its use as any other owner of other property has to it and its intended use; and because the citizen may have ceased for "many years" to use his property, his mill, storehouse, or factory, it will not do to say that he is thereby deprived from resuming its use.

We hold that the appellant was not bound to fence her road at the point where the cow of the appellee was killed. The action was based upon the statute. There was no allegation or proof of negligence. The plaintiff cannot recover under the statute, because it does not apply where the road cannot be fenced; nor can he recover at common law, because there was no proof of negligence or want of care and skill on the part of the persons operating the train.

It is well settled that when stock at large is killed by a railroad engine, at a point on the road not required to be fenced, the rights and liabilities of the parties must be de-

termined by common law principles. See *The Indianapolis, etc., R. R. Co.* v. *Caldwell,* 9 Ind. 397 ; *The Lafayette, etc., R. R. Co.* v. *Shriner,* 6 Ind. 141 ; *Williams* v. *The New Albany, etc., R. R. Co.,* 5 Ind. 111 ; *The Indiana Central Railway Co.* v. *Gapen,* 10 Ind. 292 ; *The Madison,* etc., *R. R. Co.* v. *Kane,* 11 Ind. 375 ; *The Indianapolis, etc., R. R. Co.* v. *Kinney,* 8 Ind. 402.

The judgment is reversed, with costs ; and the cause is remanded, with directions to the court below to grant a new trial, and for further proceedings in accordance with this opinion.

*S. Stansifer,* for appellant.

*F. T. Hord,* for appellee.